JOSHUA JACQUES

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

JOEY FOLSE

VS.    CIVIL ACTION NO. 2:23-CV-05737
       JUDGE JAY C. ZAINEY
       MAG. JUDGE MICHAEL NORTH

CHEVRON U.S.A., INC.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DEPOSITION OF JOSHUA JACQUES

Taken on Tuesday, July 1, 2025
At the LAW OFFICES of
LISKOW & LEWIS
1200 Camellia Blvd., Ste 300
Lafayette, Louisiana 70508

REPORTED BY:  DIXIE B. VAUGHAN, CCR

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

JUST LEGAL

9618 Jefferson Highway, Suite D-386

Baton Rouge, Louisiana

NEW ORLEANS \* BATON ROUGE \* LAFAYETTE
LAKE CHARLES \* HOUSTON

(225) 291-6595                    (855) 900-5878
www.just-legal.net          setdepo@just-legal.net

**EXHIBIT M**

JOSHUA JACQUES

```
1                    I N D E X
2                                           PAGE
3   APPEARANCES                              3
4   AGREEMENT OF COUNSEL                     5
5   EXAMINATION
6       BY MR. FOCO                          6
7       BY MR. MORSE                        26
8       BY MR. PURSER                       30
9   REPORTER'S CERTIFICATE                  37
10
11                INDEX OF EXHIBITS
12            (Exhibits are attached.)
13                                          PAGE
14  EXHIBIT 1    Photograph of worksite,     8
                 previously Exhibit 3-A from
15               Joey Folse's Vol 2
                 deposition
16
    EXHIBIT 2    Schematic of Jack/St. Malo  8
17               with circle handwritten by
                 Beau Harrington and other
18               markings subsequently marked
                 by Joshua Jacques
19
    EXHIBIT 3    Work Permit June 27th, 2023 8
20
    EXHIBIT 4    Work Permit June 28th, 2023 9
21
    EXHIBIT 5    Work Permit June 29th, 2023 9
22
    EXHIBIT 6    Photograph                 15
23               Chevron_Folse_00008
24                    * * *
25
```

```
 1        5.
 2              (Document marked as EXHIBIT 4 for
 3        identification.)
 4              (Document marked as EXHIBIT 5 for
 5        identification.)
 6        MR. FOCO:  Thanks, Mike.
 7   BY MR. FOCO:
 8        Q.   And so first of all, have you -- a
 9   little bit of background, I asked my client MMR to
10   send me their work permits --
11        A.   Okay.
12        Q.   -- relating to what work they were doing
13   on the Jack/St. Malo on those three days, and
14   that's what they sent me.
15        A.   Okay.
16        Q.   Let's look at Exhibit 3, which is the
17   June 27th, 2023 work permit.
18        A.   Okay.
19        Q.   Where does that indicate that MMR is
20   permitted to perform work?
21        A.   The work location listed is the lower
22   deck on the southwest side of the platform.
23        Q.   Okay.  Is that on the main deck where
24   Mr. Folse said he was -- he fell?
25        A.   No, sir.  This would have been the deck
```

JOSHUA JACQUES

```
 1  below.
 2       Q.    Okay.  It's a whole different deck; it's
 3  not even on the same level?
 4       A.    Correct.
 5       Q.    And so if the only permit that MMR had
 6  to perform work on June 27th, 2023 was on --
 7             What did you say it was, again?
 8       A.    The lower deck southwest area.
 9       Q.    -- then MMR was not authorized to
10  perform any work on the main deck in the area
11  where Mr. Folse fell?
12       A.    That's correct.
13       Q.    And that's something you guys enforce?
14       A.    Uh-huh.
15       Q.    Chevron enforces?
16       A.    Uh-huh.
17       Q.    You don't let the contractors just go
18  work wherever they want?
19       A.    They have to submit a work plan the day
20  before, and it has to be approved.
21       Q.    Let's look at Exhibit 4, which is the
22  work permit for June 28th, 2023.  And where does
23  that work permit indicate that MMR was authorized
24  to work that day?
25       A.    This work location is listed as the
```

JOSHUA JACQUES

```
 1   lower deck northwest.
 2        Q.    Okay.
 3              Is that the same location as
 4   Mr. Folse --
 5        A.    No, sir.  Deck below.
 6        Q.    Deck below, not even on the same
 7   level --
 8        A.    Correct.
 9        Q.    -- correct?
10              Let's look at Exhibit 5, which is the
11   January 29th, 2023 work permit for MMR.  Where
12   does that permit authorize MMR to perform work?
13        A.    This one is also the lower deck
14   northwest and then the tween deck southwest.
15        Q.    Are either of those locations in the
16   same location where Mr. Folse fell?
17        A.    No, sir.
18        Q.    Okay.  Are they on the same deck or
19   level?
20        A.    No.  They're all below that level.
21        Q.    Okay.  And so accurate to say that,
22   assuming those three permits are correct, MMR
23   would not have been authorized to perform any work
24   and was not performing any work in the area where
25   Mr. Folse allegedly fell --
```

1    A.   That's correct.
2    Q.   -- on that date?  Or the two days
3 before; correct?
4    A.   Yes, sir.
5    Q.   So I want to go back to something that
6 you were asked in your deposition about, well,
7 when you got to the scene of the accident --
8 right? -- and you said you talked to some folks
9 and there was a conversation about maybe having
10 moved the wire.  Do you remember that?
11    A.   I do.
12    Q.   And in your deposition, you said that it
13 was MMR folks that you spoke with about picking up
14 the wire or moving the wire after the incident
15 occurred; right?
16    A.   Uh-huh.
17    Q.   Do you remember that?
18    A.   I do.
19    Q.   And then you were asked do you remember
20 who you talked to.  And you didn't?
21    A.   I did not.
22    Q.   Going back now and looking at MMR's work
23 permits, does that -- does that comport with what
24 you testified to in your first deposition, that
25 you were talking to MMR folks in that area?  Or

1  you think it was somebody else, maybe?
2       A.   Honestly, I don't remember.  I don't
3  know who it would have been.  I mean, like I said,
4  it's -- it's been two years ago now, but I did not
5  know this particular person I spoke to then and I
6  don't know now.
7       Q.   Fair -- correct that you don't have a
8  specific recollection of speaking with an MMR
9  person?
10      A.   No, sir.  I could not tell you who I
11 spoke to.
12      Q.   Is it true that you maybe assumed you
13 had spoke with an MMR person because there was
14 ground wiring involved?
15      A.   That -- that could be a correct
16 assumption.
17      Q.   But looking at those permits now, would
18 you agree with me that MMR wouldn't have been
19 working in this area with ground wire on
20 June 29th, 2023?
21      A.   I would have to agree with you on that.
22      Q.   Let me give you one more bit of
23 information.  During Mr. Folse's deposition, he
24 testified that it was his understanding that it
25 was members of the Danos crew that had moved the

1  wire around after his accident.  Do you have any
2  reason to disagree with that?
3       A.   I don't.  I mean, that's the work area
4  that Danos was focusing on.  They were pretty much
5  confined to the main deck area at that time.
6       Q.   Got it.
7            Would you agree with me that that would
8  make more sense because Danos was actually
9  authorized and permitted to work in the area and
10 MMR was not?
11      A.   I mean, looking at the information, yes,
12 sir.
13      Q.   Okay.  Good enough.
14           Let me ask you this.  So one of the
15 things you said in your deposition was that -- let
16 me see -- when you first got out to the scene --
17 right? -- you took a picture of what the area
18 looked like, including the spools of green wire;
19 right?
20      A.   Uh-huh.
21      Q.   And this is Chevron_Folse_00008.  Okay?
22 Let me show you that.
23      A.   Yes, sir.
24      MR. GOLEMI:  Are we on 6?  Do you want me to
25      mark that?

JOSHUA JACQUES

```
1        MR. FOCO:  Yeah.  Might as well.
2              (Document marked as EXHIBIT 6 for
3        identification.)
4        MR. FOCO:  Thank you, Mike.
5  BY MR. FOCO:
6        Q.   I believe that's the photo you said that
7  you took that depicted what the area looked like
8  when you walked up the first time?
9        A.   Yes, sir.  That's correct.
10       Q.   That's correct?  Okay.  So that's
11 Exhibit 6.
12             In your deposition, I believe you also
13 said that when you asked the people in the area,
14 who said they had picked up the wire, to show you
15 how the wire was -- how the wire was before they
16 picked it up, they placed the wire as it appears
17 in Exhibit 1; is that correct?
18       A.   Yes, sir.
19       Q.   And so is it accurate to say that
20 based -- it was your understanding based upon the
21 conversations you had with the people at the
22 location of where the accident happened that the
23 picture in Exhibit 1 depicts the wire as it was
24 found at the time of Mr. Folse's accident?
25       A.   Yes, sir.
```

1  Q.  So let me ask you this.  One of the
2  things the picture doesn't show us is what's off
3  screen to the left of that circle and X; right?
4  At the time -- are you familiar with the relative
5  dimensions of this area of the platform --
6  A.  Uh-huh, yes, sir.
7  Q.  -- at the time Mr. Folse allegedly fell?
8       How many feet were there outside of the
9  area where he fell where he could have passed?
10 A.  Probably 5, 6 feet at least.
11 Q.  Mr. Harrington said he thought it was at
12 least 10 feet.
13 A.  Yeah.
14 Q.  Is that...
15 A.  I mean, there was a lot of work going on
16 in that area, and so they had to leave ample room
17 to be able to move in and out of the work area.
18 So usually a minimum of 5 to 6 feet is what you
19 would need.  But I mean, there was a wide open
20 space out there.
21 Q.  Let me ask you this.  Was there any
22 other structure out to the left of that --
23 A.  No.  There's nothing there.
24 Q.  Got it.  And so there was no like -- I'm
25 trying to -- I'm trying to use industry terms.

```
 1  There would have been no like leg of the
 2  platform --
 3       A.   No.
 4       Q.   -- or permanent structure out to the
 5  left right here --
 6       A.   No.
 7       Q.   -- right?
 8       A.   Everything from that point over was a
 9  wide open space.
10       Q.   Got it.
11            So tell me if this is correct.  I don't
12  want to put words in your mouth.  I think what
13  you're saying is that you can't go back for sure
14  and say there was not some temporary thing out
15  there at the time?
16       A.   That's correct.  They were moving
17  materials around, but there was no permanent
18  structure or anything in that part of the
19  platform.
20       Q.   Got it.  Got it.
21            Okay.
22            And so tell me this.  Do you see where
23  the -- the -- you mentioned earlier the plate --
24       A.   Uh-huh.
25       Q.   -- right?  And tell us, what were you
```

1  talking about there?
2       A.   So the way the platform was designed was
3  for some future expansion, which is the work we
4  were getting prepared to do at this time.  And so
5  when they built the platform, they reinforced that
6  part of the deck so that when they would set the
7  new structure, it would be supported properly.
8  And so that's why you have that little bit of a
9  beveled plate right there.
10      Q.   Got it.
11           It's just -- it's about an inch or so --
12 maybe an inch, maybe less raised from the other
13 part of the floor?
14      A.   That's correct.  The edge is smoothly
15 beveled off.  It's not like somebody just threw a
16 plate on the deck.
17      Q.   Right.
18           But so the point would be, though, would
19 you agree with me that you wouldn't consider that
20 area a walkway?
21      A.   No, sir.
22      Q.   Right?
23      A.   (Shakes head.)
24      Q.   Where the circle's drawn, Chevron
25 doesn't consider that to be a walkway?

```
1        A.    No, sir.
2        Q.    Okay.  And let me ask you this.  You're
3   an HSE --
4        A.    Uh-huh.
5        Q.    -- right?
6              Looking at that picture -- and this goes
7   back to a question Mr. Folse's attorney asked you.
8              First of all, what -- for the jury,
9   what's HS&E mean?
10       A.    Health, environmental, and safety.
11       Q.    Got it.
12       MR. GOLEMI:  So it's "HES."
13       A.    It's -- offshore, we say "HES."  In the
14  office, they say "HSE."
15  BY MR. FOCO:
16       Q.    Land-lovers?
17       A.    Yeah.
18       Q.    So safety is your job?
19       A.    Safety and compliance, yes, sir.
20       Q.    Do you see a safety hazard in that
21  picture, Exhibit 1?
22       A.    Not really.  I mean, there's ample
23  walkway space.  I mean, this is a work area, so, I
24  mean, you're going to have material staged in the
25  area.  But I mean, like we said earlier, I say
```

```
 1  there's at least 5 to 6 open feet of walkway
 2  space.
 3       Q.   That Mr. Folse could have used to
 4  traverse the area without walking where he did?
 5       A.   Yes, sir.
 6       Q.   Okay.
 7            Let's go back to Exhibit 2 for a second,
 8  which is this.  I still have it.
 9       A.   Oh, okay.
10       Q.   And so just so we know, do this.
11  Draw -- draw an arrow pointing to where the spool
12  of wire would be based on Picture 1.  Do you
13  understand that ask?
14       A.   So basically depict this (indicating) on
15  there?
16       Q.   Yeah.  Like so you drew the "X" in
17  Exhibit 2 presumably is where you were depicting
18  Mr. Folse said he fell --
19       A.   Okay.
20       Q.   -- right?  And so where would -- orient
21  us to where, for example, the spool would have
22  been in comparison to this X.
23       A.   (Labels.)
24       MR. PURSER:  Can you please hold it up to the
25       screen?
```

```
1         THE WITNESS:  Can you see?
2         MR. PURSER:  I can now.  Thank you.
3  BY MR. FOCO:
4         Q.  Do this for me.  Draw a line out to the
5  right maybe.
6         MR. GOLEMI:  Draw an arrow to it.
7  BY MR. FOCO:
8         Q.  And draw an arrow to it and mark and say
9  "spool."
10        A.  To the second one?  Okay.  (Complies).
11        MR. GOLEMI:  Go ahead and show Chris real
12        quick.
13        THE WITNESS:  (Complies.)
14 BY MR. FOCO:
15        Q.  Okay.  And so I want to make sure I
16 understand.  I want to make sure the trier of fact
17 understands when they go back and look at this;
18 right?
19        A.  Okay.
20        Q.  And so if this is where Mr. Folse was
21 when he said he fell --
22            And this is where the spool is; right?
23        A.  Uh-huh.
24        Q.  -- this area here (indicating) would be
25 the area that's not depicted to the left in that
```

```
 1  picture; right?
 2       A.   Yes, sir.
 3       Q.   And so that's kind of what you were
 4  saying earlier, this is all open space to the --
 5  out this way; right?
 6       A.   Yes.
 7       MR. GOLEMI:  For the record, to orient it, if
 8       the Chevron logo is in the bottom-right,
 9       you're talking about above and left of that
10       X; correct?
11       MR. FOCO:  Right.
12  BY MR. FOCO:
13       Q.   Why don't you write "open space" where
14  the open space is.
15       A.   Just anywhere out here or...
16       MR. GOLEMI:  Yeah.  Just give enough space
17       for the -- what you already marked.
18       A.   (Complies).
19       MR. GOLEMI:  Show Chris real quick.
20       THE WITNESS:  (Complies.)
21       MR. FOCO:  I don't think I have anything
22       else.  Thank you, Mr. Jacques.
23       THE WITNESS:  Yes, sir.
24                      EXAMINATION
25  BY MR. MORSE:
```

1           R E P O R T E R ' S   C E R T I F I C A T E
2           I, Dixie Vaughan, Certified Court
3  Reporter (Certificate #28009) in and for the State
4  of Louisiana, as the officer before whom this
5  testimony was taken, do hereby certify that on
6  Tuesday, July 1, 2025, in the above-entitled and
7  numbered cause, the DEPOSITION of JOSHUA JACQUES,
8  after having been duly sworn by me upon authority
9  of R.S. 37:2554, did testify as hereinbefore set
10 forth in the foregoing 36 pages;
11
12          That this testimony was reported by me
13 in stenographic shorthand, was prepared and
14 transcribed by me or under my personal direction
15 and supervision, and is a true and correct
16 transcript to the best of my ability and
17 understanding;
18
19          That the transcript has been prepared in
20 compliance with transcript format guidelines
21 required by statute or by rules of the board;
22
23          That I have acted in compliance with the
24 prohibition on contractual relationships, as
25 defined by Louisiana Code of Civil Procedure

```
 1  Article 1434 and in rules and advisory opinions of
 2  the board;
 3
 4          That I am not of Counsel, nor related to
 5  any person participating in this cause, and am in
 6  no way interested in the outcome of this event.
 7
 8          SIGNED THIS THE 2ND DAY OF JULY, 2025.
 9
10
11
12              DIXIE VAUGHAN, CCR
                Certified Court Reporter (LA)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1  Article 1434 and in rules and advisory opinions of
2  the board;
3
4          That I am not of Counsel, nor related to
5  any person participating in this cause, and am in
6  no way interested in the outcome of this event.
7
8          SIGNED THIS THE 2ND DAY OF JULY, 2025.
9
10
11         *Dixie B. Vaughan* (signature)
12         DIXIE VAUGHAN, CCR
           Certified Court Reporter (LA)
13