UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **JOEY FOLSE** | * | **CIVIL ACTION NO. 23-5737** |
| **VERSUS** | * | **JUDGE JAY C. ZAINEY** |
| **CHEVRON U.S.A. INC.** | * | **MAGISTRATE JUDGE MICHAEL NORTH** |

### CHEVRON U.S.A. INC.'S MEMORANDUM IN SUPPORT OF <u>MOTION FOR SUMMARY JUDGMENT</u>

Defendant Chevron U.S.A. Inc. ("Chevron") respectfully submits this memorandum in support of its Motion for Summary Judgment, which requests that the Court dismiss Plaintiff Joey Folse's ("Folse" or "Plaintiff") claims against it in this matter, with prejudice, under Federal Rule of Civil Procedure 56. As explained below, it is undisputed that (1) Chevron did not breach a duty that caused Folse's alleged injuries and (2) no defect or vice existed in the area where Folse allegedly tripped and fell. For these and the other reasons detailed below, Chevron's motion for summary judgment should be granted and Folse's claims against Chevron should be dismissed in their entirety.

### I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff alleges that on or about June 29, 2023, he sustained personal injuries on the JACK/ST MALO ("JSM"),[1] a floating oil and gas production unit owned and operated by Chevron and located on the Outer Continental Shelf in the Gulf of Mexico.[2] At the time of the incident,

---

[1] R. Doc. 38 at ¶ 3.

[2] R. Doc. 19 at ¶ III.

Folse was employed by Danos, L.L.C. ("Danos") to perform a painting project aboard the JSM.[3] Folse was allegedly returning to the mezzanine deck of the JSM "with a bucket of paint when he tripped on a wire that was left across a walkway" located between the paint mixing area and a stairwell.[4] Folse departed the JSM the same day of the Incident via a scheduled flight with an escort.[5] Folse was diagnosed with a left knee strain and administered over-the-counter medications.[6] Additionally, Folse received a full duty release to return to work.[7]

Folse filed this lawsuit against Chevron U.S.A. Inc. on October 3, 2023, alleging that Chevron was negligent because it failed to provide a reasonably safe place to work, properly supervise its employees and contracted workers, adequately maintain the JSM, and other allegations.[8] Folse's negligence allegations are as follows:[9]

> 1. Breach of a legally imposed duty of reasonable care owed by Defendant to Plaintiff;
> 2. Failure to provide a reasonably safe place to work;
> 3. Failure to properly supervise Plaintiff, his co-workers, or its employees;
> 4. Failure to take any means or precautions for the safety of Defendant's employees and other third parties working on the Jack/St. Malo, including Plaintiff;
> 5. Failure to provide minimum safety requirements;
> 6. Failure to provide adequate equipment for the job in question;
> 7. Failure to provide adequate personnel for the job in question; and
> 8. Other acts of negligence and unseaworthiness which will be shown at the trial of this matter.

---

[3] *Id.* at ¶ 6.

[4] *Id.*; *see also* Danos Investigation Report, Chevron_Folse_0000012-15, attached hereto as Exhibit A.

[5] *See* Injury/Illness Report, Chevron_Folse_0000038, attached hereto as Exhibit B.

[6] *Id.*

[7] *See* June 29, 2023 emails, Chevron_Folse_0000010, attached hereto as Exhibit C.

[8] R. Doc. 1 at ¶ VIII.

[9] R. Doc. 38 at ¶ 10.

On September 30, 2024, Folse amended his complaint, adding additional Defendants MMR Group, Inc. ("MMR") and Grand Isle Shipyard, L.L.C. ("GIS") (the "Complaint").[10] Folse alleges that MMR performed electrical maintenance, construction, and other duties on the JSM at the time of the incident.[11] Folse contends that GIS "handled, moved, delivered, and/or placed large spools of wiring on the [JSM]."[12] Folse seeks compensatory, special, and general damages against all Defendants, including past, present, and future damages for emotional pain and suffering; loss of wages, fringe benefits, and wage earning capacity; medical expenses; physical disability; and "[a]ll other special and general damages as will be shown at the trial of this matter."[13] Folse also seeks punitive damages under general maritime law for gross negligence related to Defendants' "work practices or construction/maintenance of the platform."[14] Additionally, Folse filed a claim against Danos and its insurance carrier, Starr Indemnity & Liability Company, under the Longshore and Harbor Workers' Compensation Act.[15]

At this stage of the case, summary judgment in favor of Chevron is warranted. Folse's deposition was taken twice (to allow for MMR and GIS to question the Plaintiff after being joined), and key Chevron personnel have also been deposed twice, such as Joshua Jaques, the HES Coordinator on the JSM at the time of the incident. Plaintiff's expert report deadline passed on May 26, 2025, and Defendants' expert report deadline passed on June 25, 2025.[16] Plaintiff

---

[10] *Id.*

[11] *Id.* at ¶ 4.

[12] *Id.* at ¶ 5.

[13] *Id.* at ¶ 13.

[14] *Id.* at ¶ 7.

[15] *Id.* at ¶ 8.

[16] R. Docs. 49; 55.

designated no retained experts, while MMR retained a safety expert to evaluate the root causes and contributing factors surrounding the incident involving Folse.[17] Fact discovery closes on September 23, 2025, and a jury trial is set in this case for November 10, 2025.[18] At this advanced stage of the case, Folse has presented no evidence to create a genuine dispute of material fact as to Chevron's liability. Accordingly, summary judgment in favor of Chevron is appropriate.

## II.  APPLICABLE LAW

### A. Summary Judgment Standard

Summary judgment is appropriate where, as here, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[19] Once "the moving party meets the initial burden of showing that there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial."[20] A genuine issue of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[21] "Conclusional allegations and denials, speculation, improbable inferences,

---

[17] R. Doc. 69-9, Expert Report of Michael Dardar.

[18] R. Docs. 49; 55.

[19] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").

[20] *Engstrom v. First Nat'l Bank of Eagle Lake*, 47 F.3d 1459, 1462 (5th Cir. 1995).

[21] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To defeat the motion, the non-mover "must identify specific evidence in the record and articulate the manner in which that evidence supports [his] claim, and such evidence must be sufficient to sustain a finding in [his] favor . . . at trial." *John v. Deep E. Tex. Reg. Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004) (internal citations omitted).

unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial."[22]

### B. OCSLA and Choice of Law

The Outer Continental Shelf Lands Act, 43 U.S.C. § 1331, *et seq.* ("OCSLA"), is a federal statute that "extended the 'jurisdiction and control' of the United States to 'the seabed and subsoil of the entire Outer Continental Shelf adjacent to the shores of the United States ... and also to the structures for their development such as artificial islands, drilling platforms, . . . ."[23] Although Folse did not invoke OCSLA, "[a] plaintiff does not need to expressly invoke OCSLA in order for it to apply."[24] To determine whether this case arises under OCSLA, "the Fifth Circuit employs a but-for test, asking whether: (1) the facts underlying the complaint occurred on the proper situs; (2) the plaintiff's employment furthered mineral development on the OCS [Outer Continental Shelf]; and (3) the plaintiff's injury would not have occurred but for his employment."[25] As discussed below, all of these criteria are met.

Here, OCSLA situs is established because the negligence alleged by Folse occurred on the JSM, an oil and gas production unit on the OCS.[26] OCSLA covers "installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon for the purpose

---

[22] *Oliver v. Scott*, 276 F.3d 736, 744 (5th Cir. 2002).

[23] *Amoco Prod. Co. v. Sea Robin Pipeline Co.*, 844 F.2d 1202, 1205 (5th Cir. 1988) (quoting Conference Report No. 1031, *reprinted in* 1953 U.S. Code Cong. and Ad. News 2177, 2184.)

[24] R. Doc. 1; *Barker v. Hercules Offshore, Inc.*, 713 F.3d 208, 213 (5th Cir. 2013) (citing *Amoco Prod. Co.*, 844 F.2d at 1205).

[25] *Barker*, 713 F.3d at 213.

[26] *See* R. Doc. 38 at ¶ 3; https://www.chevron.com/what-we-do/energy/oil-and-natural-gas/assets/jack-stmalo (last accessed: August 29, 2025); https://www.offshore-technology.com/projects/jackstmalodeepwaterp/ ?cf-view (last accessed: August 29, 2025).

of exploring for, developing, or producing resources, including non-mineral energy resources."[27] Although the Fifth Circuit has not yet analyzed the OCSLA situs requirement in relation to floating production units, it has held in at least two cases that floating production units are platforms as opposed to vessels, as discussed further below.[28] Second, it is well-established in this circuit that Folse's painting work, which was associated with construction to expand the JSM[29], furthered mineral production on the OCS.[30] Third, Folse's injury, which allegedly involved tripping on a wire on the JSM during his painting duties, would not have occurred but for his employment with Danos on the JSM. Accordingly, this case arises under OCSLA.

OCSLA provides that "the law of the adjacent state applies unless the principles of the applicable state law conflict with any federal law."[31] However, because Folse asserted claims purportedly under general maritime law, the Court must determine whether maritime law applies of its own force to displace otherwise applicable federal or state law.[32] "[F]or maritime law to

---

[27] 43 U.S.C. § 1333(a)(1)(A)(iii).

[28] *See Warrior Energy Servs. Corp. v. ATP Titan M/V*, 551 F. App'x 749, 752 (5th Cir. 2014) (holding that the Titan, a floating production unit on the OCS, was not a vessel for purposes of the Maritime Lien Act); *Baker v. Dir., Off. of Workers' Comp. Programs*, 834 F.3d 542, 547 (5th Cir. 2016) (holding that the Big Foot, a floating production unit on the OCS, was not a vessel under the LHWCA, and that plaintiff's job, which was shore-based construction of living quarters to be later installed on the Big Foot, had no causal link with operations on the OCS, so OCSLA ultimately did not apply).

[29] July 1, 2025 Deposition of Joshua Jaques ("2025 Jaques Depo.") at 21:25–22:9, excerpts attached hereto as Exhibit D; July 1, 2025 Deposition of Beau Harrington ("2025 Harrington Depo.) at 9:4–12, excerpts and deposition exhibits attached hereto as Exhibit E.

[30] *See, e.g.*, *Meeks v. BIS Salamis, Inc.*, No. CV H-09-3211, 2011 WL 13334202, at *4 (S.D. Tex. Oct. 18, 2011) (holding that plaintiff's "sandblasting and painting duties [on Exxon platforms on the OCS] furthered mineral development"); *Cormier v. Clemco Servs. Corp.*, 48 F.3d 179, 181 (5th Cir. 1995) (applying OCSLA to tort claims asserted by a sandblaster and painter who was injured while working on a Pennzoil-operated platform on the OCS).

[31] *Galbraith v. Constr. Tech. Servs., Inc.*, CIV.A. 13-00449-SDD-, 2015 WL 542305, at *2 (M.D. La. Feb. 10, 2015) (applying Louisiana law under OCSLA to negligence claims against Chevron in connection with personal injuries alleged on the GENESIS spar platform).

[32] R. Doc. 1 at ¶ II; *Barker*, 713 F.3d at 214.

6

apply to an OCSLA tort action such as this one, there must be both a 'maritime situs and a connection to traditional maritime activity.'"[33] The locus prong examines whether "the tort at issue either 'occurred on navigable water,' or if the injury is suffered on land, that it was 'caused by a vessel on navigable water.'"[34]

The locus prong of the maritime tort analysis is not met here. The JSM is a floating oil and gas production unit located on Walker Ridge Block 718 on the Outer Continental Shelf of the United States, approximately 280 miles south of New Orleans, Louisiana.[35] The JSM acts as a production hub for multiple subsea wells, and is "permanently moored using a chain-polyester rope-chain configuration, anchored to the seafloor with suction pile."[36] The Supreme Court in *Rodrigue v. Aetna Casualty & Surety Co.* held that offshore oil and gas platforms are akin to "artificial islands," thus torts occurring *on* platforms are not within the Court's admiralty jurisdiction.[37] The Court explained that because offshore platforms are essentially "islands, albeit artificial ones, . . the accidents had no more connection with the ordinary stuff of admiralty than do accidents on piers."[38] The Fifth Circuit has held in at least two opinions[39] that, due to their

---

[33] *Barker*, 713 F.3d at 215.

[34] *Id.* (quoting *Jerome B. Grubart, Inc., v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995)).

[35] R. Doc. 38 at ¶ 3; https://www.chevron.com/what-we-do/energy/oil-and-natural-gas/assets/jack-stmalo (last accessed August 29, 2025); www.data.bsee.gov/PDFDocs/Scan/ROW/26/26922.pdf (last accessed: August 29, 2025).

[36] https://ww2.eagle.org/content/dam/eagle/articles/EandP%20Magazine_May%202014_FPU%20Verification%20Facilitates%20Regulatory%20Compliance.pdf (last accessed: August 29, 2025).

[37] *Rodrigue v. Aetna Cas. & Sur. Co.*, 395 U.S. 352, 355 (1969) (citing *The Poughkeepsie*, 162 F. 494, 496 (S.D.N.Y.), *aff'd*, 212 U.S. 558 (1908) ("The Lands Act makes it clear that federal law, supplemented by state law of the adjacent State, is to be applied to these artificial islands as though they were federal enclaves in an upland State.").

[38] *Id.*

[39] *See, e.g.*, *ATP Titan M/V*, 551 F. App'x at 752 (holding that the Titan, a floating production unit on the OCS, is not a vessel under the Lozman test because it "is not practically capable of transportation on water and is therefore, as a matter of law, not a vessel"); *Baker*, 834 F.3d at 547 ("Like the floating home in *Lozman*, Big Foot has no means of self-propulsion, has no steering mechanism or rudder, and has an

nature, floating production units like the JSM are platforms as opposed to vessels because they are "not capable of being used for marine transport in any meaningful sense."[40] Accordingly, maritime law does not apply of its own force to the claims alleged by Folse.[41]

Even if the first prong were satisfied, the second prong, which evaluates the nexus to traditional maritime commerce and traditional maritime activity, is not met here. Under this second prong, the plaintiff must show that the incident caused a "potentially disruptive impact on maritime commerce," and that "the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity."[42] Here, Folse makes no allegation that his isolated injuries during a painting project disrupted maritime commerce, nor has he presented any evidence demonstrating same. As the Fifth Circuit previously held, "[i]n the absence of an explanation as to why a single worker injury . . . has a potentially disruptive impact on maritime commerce," the nexus prong is not met.[43] Second, injuries that occur as a result of offshore drilling are generally not related traditional maritime activity.[44] As noted above, the Fifth Circuit has held that Folse's painting work, which was associated with construction and expansion of the JSM,

---

unraked bow. Big Foot can only be moved by being towed through the water, and when towed to its permanent location, Big Foot will not carry 'items being transported from place to place (e.g., cargo),' but only 'mere appurtenances.'").

[40] *Stewart v. Dutra Const. Co.*, 543 U.S. 481, 482 (2005) ("A watercraft is not capable of being used for maritime transport in any meaningful sense if it has been permanently moored or otherwise rendered practically incapable of transportation or movement.")

[41] Folse alleges "other acts of negligence and unseaworthiness" in his complaint. R. Doc. 38 at ¶ 10. However, because maritime law does not apply, Folse's Jones Act negligence (to the extent asserted) and unseaworthiness claims under general maritime law have no merit.

[42] *Great Lakes,* 513 U.S. at 534.

[43] *Barker*, 713 F.3d at 215.

[44] *Id.* at 217 (citing *Texaco Expl. & Prod., Inc. v. AmClyde Engineered Prods. Co.*, 448 F.3d 760, 771 (5th Cir.), *amended on reh'g*, 453 F.3d 652 (5th Cir. 2006)).

furthered mineral production on the OCS.[45]  Accordingly, general maritime law does not apply of its own right in this matter for these reasons as well.

Folse alleges that Chevron's negligence on the JSM caused his personal injuries, specifically alleging there was a green wire stretched out across a walkway that caused him to trip.[46]  "Louisiana vicarious-liability and negligence law is applicable and not inconsistent with other federal laws" where the alleged negligence occurs on a platform on the Outer Continental Shelf.[47]  Because no such conflict exists between Louisiana and federal law with regard to the torts Folse has alleged, Louisiana negligence law applies as the "surrogate federal law."[48]

### C.  Louisiana Negligence Law

Folse generally alleges "negligence" on the part of Chevron as owner of the JSM but does not specify what, if any, Louisiana Civil Code articles he has sued under.[49]  However, his negligence allegations appear to fall under two theories: general negligence by Chevron and premises liability of Chevron, as the JSM's owner. Under La. Civ. Code art. 2315, Louisiana's general negligence statute, "[e]very act of man that causes damages to another obliges him by whose fault it happened to repair it."[50]  Louisiana employs a "duty/risk" negligence formulation, which is similar to that found in common law.[51]  To prevail on a negligence claim under Article 2315, the plaintiff must meet five elements:

---

[45] *See, e.g.*, *Meeks*, 2011 WL 13334202, at *4; *Cormier*, 48 F.3d at 181.

[46] R. Doc. 38 at ¶ 10.

[47] *Coleman v. BP Exploration and Production, Inc.*, 19 F.4th 720, 730 (5th Cir. 2021).

[48] *Id.*

[49] Folse asserted negligence against Chevron in its capacity as owner of the JSM, as Chevron is not Folse's employer.

[50] La. Civ. Code art. 2315.

[51] *Detraz v. Lee*, 950 So. 2d 557, 562 (La. 2007).

> (1) proof that the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) proof that the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) proof that the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) proof that the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) proof of actual damages (the damages element).[52]

Under Louisiana law, a platform owner's duty is "to ensure the safety of the premises is implicated only when the owner *creates* the hazardous condition at issue."[53] Article 2317.1, which is one of Louisiana's premises/custodial liability provisions, provides that "[t]he owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect."[54] "To prevail on a custodial liability claim, a plaintiff must prove four things: '(1) the object was in the defendant's custody; 2) the [object] contained a vice or defect which presented an unreasonable risk of harm to others; (3) the defective condition caused the damage; and (4) the defendant knew or should have known of the defect."[55] Article 2322 is another premises liability provision, and it instructs that owners are liable for damages incurred through the building's ruin or defects in the building's original construction.[56] Article 2322 has also been applied to offshore platforms, and the owner may be answerable "only when the ruin is caused by either neglect to repair the building or vice in its original construction."[57]

---

[52] *Id.* (quoting *Fowler v. Roberts*, 556 So. 2d 1 (La. 1989), *abrogated on other grounds by Gregor v. Argenot Great Cent. Ins. Co.*, 2002-1138 (La. 5/20/03); 851 So. 2d 959)).

[53] *Galbraith*, 2015 WL 542305, at *2 (emphasis added).

[54] La. Civ. Code art. 2317.1.

[55] *Galbraith*, 2015 WL 542305 at *2.

[56] La. Civ. Code art. 2322.

[57] *Ainsworth*, 829 F.2d at 552 (citing La. Civ. Code art. 2322).

10

As discussed below, Folse has presented no evidence to show that Chevron created or was on notice of a hazardous condition on the deck of the JSM.

## III. ARGUMENT

### A. Chevron Did Not Breach a Duty That Caused Folse's Alleged Injuries

To prevail on a negligence claim under Louisiana law, the plaintiff must present the following: "proof that the defendant had a duty to conform his conduct to a specific standard;" "proof that the defendant's conduct failed to conform to the appropriate standard;" "proof that the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries;" "proof that the defendant's substandard conduct was a legal cause of the plaintiff's injuries;" and "proof of actual damages."[58] In order to prove a premises liability claim, the movant must show that the defendant "knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage."[59]

First, Folse has failed to demonstrate *any* substandard conduct on the part of Chevron that related to or caused his injuries. Folse testified that the only thing he believes Chevron did wrong was "whatever that was I tripped on shouldn't have been there."[60] However, Folse has presented no evidence to show that Chevron or one of Chevron's employees placed or left the item he allegedly tripped on there. Folse has not pointed to any Chevron policy that Chevron failed to comply with in relation to the incident. Moreover, Folse has presented no evidence that Chevron was on notice of any alleged vice or defect in the area where he fell. As detailed further below,

---

[58] *Detraz*, 950 So. 2d at 562 (quoting *Fowler*, 556 So. 2d at 1).

[59] La. Civ. Code art. 2317.1; *see also* La. Civ. Code art. 2322.

[60] July 30, 2024 Deposition of Joey Folse ("2024 Folse Depo.") at 228:10–15, excerpts attached hereto as Exhibit F.

11

Folse even testified that he tripped in the same exact area he traversed 20 minutes earlier and had not noticed a wire outstretched in the area.[61] Accordingly, there is no genuine dispute of material fact that, under Louisiana law, Chevron did not breach a duty that caused Folse's alleged injuries.

### B. No Vice or Defect Existed in the Area Where Folse Allegedly Fell

#### i. *Folse's own testimony establishes that there was no hazard*

There is no genuine dispute of material fact that there was no defect or vice present on the JSM platform on June 29, 2023. That morning, Folse participated in a safety meeting conducted by his employer, Danos, and then reported to the painting site on the JSM.[62] Folse confirmed that he signed a Danos Job Safety Analysis regarding trip hazards that morning.[63] Folse proceeded to paint and eventually took a break in the galley, at the end of which Folse was instructed by his Danos supervisor to get more paint from the Danos paint shed.[64] The Danos paint shed was located on another deck level and was a 2-5 minute walk from the painting area.[65] On his way to the paint shed, Folse walked through the same area of the deck where he later allegedly tripped.[66] Folse testified that he did not see any tripping hazards during his walk to the paint shed.[67] He waited in the paint shed for about 20 minutes, grabbed a one-gallon paint can without a lid, put on his respirator, and proceeded to traverse the same area.[68] Folse claims that he tripped over a green

---

[61] *Id.* at 191:12-192:12.

[62] *Id.* at 174:13–176:7 and Deposition Exhibit 1, Chevron_Folse_0000237–52.

[63] *Id.* at 153:4–157:21, 177:3–21, Deposition Exhibit 1 at Chevron_Folse_0000249.

[64] *Id.* at 182:9–184:6.

[65] *Id.* at 187:7–12.

[66] *Id.* at 186:25–187:2.

[67] *Id.* at 226:7–23.

[68] *Id.* at 186:25–187:2, 191:12–192:14.

wire that he had not noticed 20 minutes earlier, causing his chest to land on top of the paint can, while his hands and knees landed on the ground.[69]

During Folse's second deposition, he was shown a photo of the same area taken soon after the incident during Chevron's investigation.[70] Folse confirmed that this photo depicts the area where he allegedly fell on June 29, 2023.[71] Folse was asked to draw an arrow to show the direction he was walking toward the paint shed (black arrow in the upper left portion of the photo) and an arrow showing the direction he walked as he returned from the paint shed (blue arrow in the bottom right corner).[72] Folse circled a small area where he claims the wire was located at the time he fell (the blue circle).[73] Folse was then asked to draw an "X" to show exactly where he fell (the blue X next to the blue circle).[74] The deposition exhibit with Folse's markings is shown below:

---

[69] *Id.* at 192:8–195:2.

[70] May 8, 2025 Deposition of Joey Folse ("2025 Folse Depo.) at 7:22–8:14 and Deposition Exhibit 3a, excerpts attached hereto as Exhibit G.

[71] *Id.*

[72] *Id.* at 9:22–13:5.

[73] *Id.* at 13:6–16.

[74] *Id.*

13



### ii. *The area where Folse allegedly tripped was not a walkway*

Beau Harrington, who served as "Operations Tech 3" aboard the JSM at the time of the incident, confirmed that this same photo depicted the area where Folse allegedly fell on June 29, 2023.[75] Mr. Harrington described the area where Folse fell as being next to a "pretty large open area."[76] He explained that the location where Folse placed a small blue circle was the edge of a

---

[75] August 27, 2024 Deposition of Beau Harrington ("2024 Harrington Depo.") at 13:8–10, excerpts attached hereto as Exhibit H; 2025 Harrington Depo. at 7:8–20.

[76] 2025 Harrington Depo. at 8:20–24.

14

steel plate welded to the platform.[77] Mr. Harrington testified that the green wire was located atop the plate up against a "bumper" associated with the planned installation of a new module.[78] Mr. Harrington further testified that he wouldn't consider this area a walkway.[79] Mr. Harrington's testimony was based on his first-hand knowledge, as he traversed this same area while working on the JSM during the relevant timeframe.[80]

Josh Jaques, who served as the Health, Environmental, and Safety Coordinator on the JSM during the relevant timeframe, also testified that the area Folse marked on the above deposition exhibit was an accurate representation of the incident location.[81] Mr. Jaques further testified that the locations Folse marked with a circle and an "X" would not have been considered a walkway because there was an entire open deck in which Folse could have walked next to the place where the spool was being stored out of the way.[82] Mr. Jaques' testimony is also based on his first-hand knowledge, as he testified that he worked on the JSM for eleven years and was familiar with what the JSM looked like at the time of the incident.[83]

During their depositions, Mr. Harrington and Mr. Jaques were shown a schematic of the JSM at the time of the incident, which they both confirmed illustrates the layout of the main deck

---

[77] *Id.* at 9:14–17.

[78] *Id.* at 9:4–12.

[79] *Id.* at 8:7–9:12.

[80] *Id.* at 17:16–23.

[81] 2025 Jaques Depo. at 23:2–14, 17:11-25; August 27, 2024 Deposition of Joshua Jaques ("2024 Jaques Depo.") at 17:1–7, excerpts attached hereto as Exhibit I.

[82] 2025 Jaques Depo. at 22:17–23:1.

[83] *Id.* at 18:4–14.

at the time of the incident.[84] Mr. Harrington was asked to mark the area where Mr. Folse fell, and placed an "X" on the schematic, as depicted below.[85]



Mr. Harrington estimated that there were at least ten feet of space open to the left of where Folse allegedly fell, leaving plenty of space for Folse to walk.[86] Mr. Jaques also confirmed that there was no leg of the platform or permanent structure to the left of where Folse fell, that would

---

[84] 2025 Harrington Depo. at 9:18–10:23 and Deposition Exhibit 2, Chevron_Folse_0000790; 2025 Jaques Depo. at 17:9–25.

[85] 2025 Harrington Depo. at 10:20–12:3 and Deposition Exhibit 2, Chevron_Folse_0000790.

[86] *Id.* at 11:2–13:2.

16

have confined him to the steel plate with the wire spools.[87] He testified that there were at least five to six feet of open space to the left of where Folse allegedly fell.[88]

### iii. *No defect or vice existed in the area where Folse allegedly fell*

During his deposition, Mr. Jaques testified that the circular outline shown in the photo above was a steel plate welded to the platform that was "smoothly beveled off"[89] as it tied into the deck, as depicted below. Mr. Jaques explained that "the way the platform was designed was for some future expansion, which is the work we were getting prepared to do at this time. And so when they built the platform, they reinforced that part of the deck so that when they would set the new structure, it would be supported properly."[90] Mr. Jaques added that because construction was underway, he would expect to see materials such as the wire spools depicted in the photo staged in this area of the JSM.[91]

On August 27, 2025, Bryan Talbert, a Facilities Engineer for Chevron, took photos of the same circular area on the JSM where Folse alleges he tripped and fell.[92] Mr. Talbert also stated that the circular area is a piece of reinforced steel welded to the main deck of the JSM[93] and confirmed that the steel has a beveled edge that ends flush with the deck and has a gradual rise

---

[87] *Id.* at 20:24–21:3.

[88] 2025 Jaques Depo. at 20:7–20.

[89] *Id.* at 21:20–22:16.

[90] *Id.* at 21:22–22:9.

[91] *Id.* at 23:20–25.

[92] Declaration of Bryan Talbert and attached photos ("Talbert Declaration"), at ¶ 5. attached hereto as Exhibit J.

[93] *Id.* at ¶ 6.

toward the center of the circle of approximately three-quarters of an inch, as shown in the below photographs:[94]

 

Under Louisiana law, this smooth, three-fourth of an inch slope does not constitute a tripping hazard. "Louisiana courts have repeatedly held that elevations of up to two inches do not present an unreasonable risk of harm."[95] For example, in *King v. Odeco, Inc.*, another Section of this Court examined whether the elevation differential in steel grating located on the floor of an

---

[94] *Id.* at ¶ 6 and pp. 3–4 (Chevron_Folse_0000791–92).

[95] *Lacaze v. Walmart Stores, Inc.,* No. CV 20-696-JWD-EWD, 2022 WL 4227240, at *4 (M.D. La. Sept. 13, 2022) (quoting and concurring with Walmart's brief); *see also Boyle v. Bd. of Sup'rs, La. State Univ.*, 1082-84 (La. 1/14/97); 685 So. 2d 1080 (depression of up to one inch in a sidewalk did not pose unreasonable risk of harm); *Leonard v. Par. of Jefferson*, (La. App. 5 Cir. 4/26/05); 902 So. 2d 502, 505 (sidewalk height differential of one inch to one-and-one-third inch did not present unreasonable risk of harm).

offshore oil production platform posed an unreasonable risk of harm.[96] The testimony provided by the platform owner and operator's witnesses was that the differential was at most one inch or in the range of five-eighths to one inch and that it did not pose an unreasonable risk.[97] Plaintiff estimated that the differential was "as much as an inch and a half" or "about an inch."[98] The Court held in Murphy Oil's favor, stating that "it cannot conclude that Murphy should have changed out the grating, or welded it down. The protrusions simply did not pose an unreasonably dangerous condition."[99] The same result is warranted in the case at bar.

In summary, despite his burden to do so, Folse has not demonstrated that a vice or defect existed in a walkway that he was required to traverse on June 29, 2023. The testimony of Folse, Harrington, and Jaques confirm that the area where Folse traversed on June 29, 2023, was not in fact a walkway, that no tripping hazard existed in the area where Folse allegedly fell, nor was there an unreasonably dangerous condition. Accordingly, there are no genuine disputes of material fact as to Chevron's lack of liability in this case.

## IV.   CONCLUSION

The theories of negligence and premises liability that Folse sets forth, namely that Chevron was negligent because there was a green wire allegedly located in a walkway that Folse traversed, fail under Louisiana law. There is no genuine dispute of material fact that (1) Chevron did not breach a duty that caused Folse's alleged injuries and (2) no defect or vice existed in the area where

---

[96] *King v. Odeco, Inc.*, No. CIV. A. 94-2117, 1995 WL 626163, at *5 (E.D. La. Oct. 23, 1995), *aff'd*, 106 F.3d 396 (5th Cir. 1997).

[97] *Id.* at *2.

[98] *Id.*

[99] *Id.* at *5.

19

Folse allegedly tripped and fell. Thus, summary judgment in favor of Chevron is warranted, and Folse's claims against Chevron should be dismissed in their entirety, with prejudice.

Respectfully submitted,

**LISKOW & LEWIS**

Michael A. Golemi (La. Bar No. 26306)
1001 Fannin Street, Suite 1800
Houston, Texas 77002
Telephone: (713) 651-2900
Facsimile: (713) 651-2908
E-mail: magolemi@liskow.com

and

*/s/ Nicolette S. Kraska*
Nicolette S. Kraska (La. Bar No. 39431)
701 Poydras St., Suite 5000
New Orleans, LA 70139
Telephone: (504) 581-7979
Facsimile: (504) 556-4108
E-mail: nkraska@liskow.com

**ATTORNEYS FOR CHEVRON U.S.A. INC.**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 29, 2025, a copy of the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system.

*/s/ Nicolette S. Kraska*